JAMES P. BURROUGHS AND JONATHAN E. BURROUGHS v. THE GRAND TRUNK RAILWAY COMPANY.

*Common carriers—Bill of lading—Perishable goods—Evidence—Common-law liability.*

1. In this case, the judgment being affirmed by an equal division of the Court, *nothing* is decided.

2. MORSE, J., filed an *affirmative* opinion, concurred in by SHERWOOD, J., holding:

   *a*—That the shipping receipt of the Chicago & Grand Trunk Railway Company, introduced in evidence, providing that the eggs shipped should be at the owner's risk, was irrelevant to the case, and that defendant must be held to have received the property as a common carrier, without any limitation or conditions as to its liability, save such as the law creates and imposes.

   *b*—That, on removing the eggs from the car at Buffalo, defendant became liable as a warehouseman, and was bound to exercise common and ordinary prudence in storing them; and that, if the building in which they were stored was not a proper place for such storage in the winter time, the defendant was guilty of negligence, and liable in damages.

c—That it was immaterial to the issue to show that railroad companies, both in Buffalo and Michigan, *generally* have and use warehouses which are not a protection to perishable property against freezing, and they do not undertake to give such protection to property in their warehouses.

3. CAMPBELL, C. J., filed an opinion, concurred in by CHAMPLIN, J., favoring a reversal, and holding:

a—That the way-bill on which the eggs were shipped from Flint provided expressly that they should be at the owner's risk, and that the terms of a bill of lading *may* apply all through where taken by separate carriers, and will do so if such was the *intention*, which is a question for the jury.

b—That it would be an *oppressive* and *unreasonable* requirement to compel railroad companies to keep out of use their special cars, or any of them, to wait the convenience or caprice of consignees, and that in this case the delay of the consignee in removing the property .cut off any right of recovery whatever, being not only *contributory* but *decisive*, negligence.

c—That no authority has been shown requiring defendant to build a warehouse with safeguards against destruction of such very perishable articles by extreme cold, and that the court erroneously refused to allow it to show that the warehouse in question compared favorably with those in general use by warehousemen, of which courts must be supposed to possess the usual knowledge; and that it cannot be considered wrong for transportation companies to use what is *generally* considered suitable.

Error to Wayne.  (Jennison, J.)  Argued April 28, 1887. Decided October 27, 1887.

Case.  Defendant brings error.  Affirmed by an equal division of the Court.  The facts are stated in the opinion.

*L. C. Stanley,* for appellant.

*Long & Gold,* for plaintiffs.

MORSE, J.  On the tenth day of December, 1884, the firm of Burroughs & Carter, doing business at Flint, Michigan, and composed of the plaintiffs and one M. Carter, shipped to said Carter at Buffalo, New York, a part car-load of eggs by the way of the Chicago & Grand Trunk Railway, and the railway of the defendant.  Carter was a resident of Flint.  There were 64 barrels and 14 crates of these eggs, containing in all 4,900 dozen, and of the value of from 24 to 25 cents per dozen.  They were in good order when shipped.

The eggs were received at Flint by the Chicago & Grand Trunk Railway Company, and placed in a common refrigerator car, properly iced to protect them from frost. At Fort Gratiot, Michigan, the defendant, as a connecting line, took possession and charge of the goods for the remainder of the carriage to Buffalo.

The eggs arrived at Buffalo on the night of the eleventh of December, 1884, and the next morning, between the hours of 7 and 9 o'clock, they were unloaded by the defendant's agents, and put in the warehouse of the company.

This warehouse had a floor composed of four-inch plank, and a matched board roof with iron covering. The sides were of inch or inch and a quarter boards, battened on the outside at the joints, with sheathing on the inside from four to five feet high, with six inches space between. The building is all inclosed to the ground, and the walls and roof are weather-tight. It was in evidence on behalf of the defendant that the doors were always kept closed in the winter-time, except when unloading freight, and only one door is kept open at such time.

Some effort was made to find the residence or whereabouts of Carter in Buffalo. What was done, however, in this direction, up to the seventeenth of December, is not very clearly shown. The person whose duty it was to notify consignees under such circumstances cannot remember what he did specifically. Thinks he followed the usual custom to notify by mail, and also telephoned to three commission houses inquiring if they knew anything about Carter. On the seventeenth he telegraphed to S. F. McKay, the freight agent at Flint, to get better address for the eggs, as Carter was unknown in Buffalo. He received telegram in answer on the eighteenth that Carter had been notified. Carter does not deny such notice.

Carter arrived in Buffalo on the night of Friday, the nineteenth. He did not call on the defendant for the eggs, but

67 MICH.—23.

sent a man on Saturday morning to tell the "Grand Trunk folks" that he would be back Monday morning to see to the eggs. He went to the freight house of the defendant on Monday, December 22. At the same time the car partly loaded was shipped, another full car of eggs was also sent. These were not unloaded by the defendant, and were ordered on this day, the twenty-second, by Carter, to be sent on to New York, and were so sent. It does not appear in what condition the eggs in this full car were. The agent asked him what he wished done with the other lot, the eggs in question in this suit, and he answered, "I will let you know." Carter never gave any directions about the eggs afterwards, or took any further notice of them.

It was testified that eggs packed as these were would freeze in this warehouse at 8 deg. above zero. The warehouse was much exposed to the prevailing winds, which were from the west and south-west, and the mean temperature at the signal office in Buffalo was on the eighteenth, nineteenth, and twentieth of December about 5, 2, and 7 deg. above zero, respectively, and the lowest temperature during the time the eggs were there was as follows: On the seventeenth, 7 deg. 3 min.; eighteenth, 1 deg. 9 min.; nineteenth, 3 deg. 5 min.; and on the twentieth, 0 deg. 7 min. Before the seventeenth the lowest record was 19 deg. above zero.

Soon after the twenty-second the eggs were examined, and all found to be frozen, and thereby rendered worthless.

The firm of Burroughs & Carter assigned their claim for the loss of these eggs to the plaintiffs, who brought suit in case in the circuit court for the county of Wayne, and recovered a judgment against the defendant therein in the sum of $1,344.

Upon the main question in the case the court instructed the jury that the defendant was liable as a warehouseman, and was bound to deposit the eggs in a safe and commodious place, which would protect them from the elements, and such

a place as persons generally would be willing to leave property like this for safe keeping, and that, even though the owner did not call for his goods in a reasonable time, that fact would not excuse the defendant.  It would only subject the owner to a charge for storage after a reasonable time has elapsed.

"If you believe from the evidence that the building was not a proper place to store eggs in, in the winter-time, then the defendant is guilty of negligence, and liable in damages."

At the close of the plaintiffs' evidence their counsel introduced the shipping receipt of the freight in question, which contained conditions, and was signed by S. F. McKay, as agent of the Chicago & Grand Trunk Railway Company. The ninth clause of the conditions therein contained reads as follows:

"That the company will not be responsible for damage occasioned by delays from storms, accidents, or other unavoidable causes, or by the decay or injury of perishable' articles, or from injury to property produced by *frost*, heat, or the elements.  Perishable property must always be prepaid."

Other conditions limited the liability of the company to that of a warehouseman while the goods were in its store-house, and expressly provided that its liability should not continue after the goods were delivered by it to any other carrier, and that in such delivery the company should act—

"As the agent of the consignor or consignee, and not as carriers, and will not be liable or responsible for any loss, damage, or injury to the property after the same shall have been sent from any warehouse or station of the company."

Thereupon the defendant's counsel moved the court to strike out the testimony in the case, on the ground that the declaration proceeded in an action on the case, on the theory of the carrier's duty to carry and deliver this property, while the testimony showed a special contract, and therefore a fatal variance between the pleadings and the proof.  The

motion was overruled, and the defendant then put in its testimony.

I cannot see any relevancy or bearing this contract has upon the case. It was not made with the company sued, nor has such company in any manner adopted it. There has been no agreement, express or implied, between the consignors or consignee and the defendant, that either party should be bound by its terms or conditions, and it did not inure to the benefit of the defendant as a matter of law. It was expressly limited and confined to the Chicago & Grand Trunk Company, and that company only bound itself to pass the goods over to some other line. There is no hint anywhere in it that its agreements or conditions were to be binding upon anyone save the contracting company and the shipper.

The defendant must be held to have received these eggs as a common carrier without any other contract, and without any limitations or conditions as to its liability, save such as the law creates and imposes. *McMillan v. Railroad Co.*, 16 Mich. 118–121, per COOLEY, J. See also, opinion of CAMPBELL, J., at page 131; *Oil Co. v. Railroad Co.*, 54 N. Y. 197, 202. Therefore the motion was properly overruled, as its introduction in evidence could not, as far as the liability of the defendant was concerned, make any difference in the issue between the parties, and was therefor not inconsistent with the allegations of the declaration. Had this instrument been the shipping receipt of the defendant company or its agent, and been signed by the shipper, the question might then have arisen in a variety of ways as to its effect upon the rights of the parties. But by the very paper itself it seems that the Chicago & Grand Trunk Company was not the agent of the defendant in receiving these goods at Flint, and giving this receipt, but expressly made itself, by this receipt, the agent of the consignor or consignee when it delivered the property to the defendant. Therefore it must

be considered, as before said, that the defendant, in receiving this property at Fort Gratiot from the cars or station of the Chicago & Grand Trunk Company, dealt with the consignors, and received it from them without reference to any agreement made at Flint at the time of shipping, and took the goods as a common carrier without any limitation upon the usual and ordinary duties and liabilities of a common carrier.

This view of the case disposes also of all the questions raised upon this contract during the trial. The case must be treated in all respects as if no such contract existed. I have not considered it necessary to examine the validity of this shipping receipt as to its conditions and limitations under the statutes of this State, which require that such receipt, if intended to lessen or abridge the common-law liability, should be signed by the shipper as well as the carrier. See on this subject, *Feige v. Michigan Central R. R. Co.*, 62 Mich. 1.

It was the duty of the defendant company, when it received these eggs at Fort Gratiot, to safely deliver them at Buffalo. The company performed its duty as far as the carriage was concerned, and there is no fault found with it in that respect.

But instead of keeping these eggs in the refrigerator car, as it did the others in the full car, until the same were called for by the consignee, and before its agents had taken any steps to notify him, or knew wnether or not he was to be found in the city, its agents unloaded these eggs, and placed them in a warehouse where they were liable to be frozen on any day they remained there. It is to be expected, as a natural result, that the temperature may drop to eight deg. above zero, and lower, at any time in the month of December in the latitude of Buffalo.

I think the court below was right in his charge above given.

The defendant was certainly liable, as a warehouseman, the moment it removed the eggs from the car, and was bound to exercise common and ordinary prudence in the storing of them. It was certainly bound to take the same care of the property that an ordinarily prudent man would exercise over his own goods.

I hardly think that, if these 4,900 dozen of eggs had belonged to the railroad company, its agents would have taken them out of this refrigerator car and placed them in this warehouse.

Nor did the delay of Carter in calling for them avoid the defendant's liability. By removing the eggs from the car without notice to the consignee, and without knowing whether or not he was a resident of Buffalo, the defendant became a bailee of the consignee, and was liable if it did not exercise ordinary care in keeping the property safe and secure. If the eggs had been left in the car, and frozen there, the delay of Carter in calling for them would have been of some moment. But it seems he took the eggs in the other car without demur or complaint, as he probably would these had they been left as shipped.

If the custom shown, to unload cars that are not full, excused the defendant from leaving them in the car a reasonable time, it was certainly its duty when its agent took them out to provide at least an equally safe place of storage for them.

The court correctly ruled upon the trial that it was immaterial to the issue to show that in Buffalo, as well as in the State of Michigan, the railroad companies generally have and use warehouses, in their usual course of business, which are not a protection to perishable property against freezing, and that they do not undertake to protect such property against freezing in their warehouses.

The duty and the liability of the defendant, under the circumstances, did not depend upon what other railroad com-

panies did, either in Buffalo or in the State of Michigan.

The defendant, by its own voluntary action, became the bailee of this property, and was bound to the duties and liabilities of a warehouseman, and as such was obliged to use ordinary care in the housing of these eggs; and it was a question for the jury to determine whether or not it exercised such ordinary care in placing the eggs in a building of this kind in the month of December. And it cannot be said that the jury were not justified in finding that the defendant did not use such care. I do not think it could well be called ordinary care or prudence to place eggs, in the middle of December, in any place where they would freeze if the temperature went below 8 deg. above zero.

The judgment of the court below is therefore affirmed, with costs.

SHERWOOD, J., concurred with MORSE, J.

CAMPBELL, C. J. In this case plaintiffs recovered for eggs shipped from Flint to Buffalo, and frozen there in the warehouse, after a delay of several days to call for them. Several matters presented on the trial were ignored by the judge, who directed a verdict upon the single question whether the building was suitable to store eggs in freezing weather, referring probably to such weather as destroyed the eggs in question.

I think there were several questions which were proper for the jury, if there was any doubt in the case; but it seems to me that on the facts concerning which there is no real dispute it would be very difficult to sustain a recovery.

The way-bill on which the eggs were shipped from Flint provided expressly that the eggs should be at the owner's risk. It was claimed on the argument that this related only to the journey to Port Huron, where the defendant is claimed to have taken them as a separate carrier. But there is no doubt that the terms of a bill of lading may apply all

through, and will do so if such is the intention.    I think this record very clearly furnishes evidence of such intention, which was for the jury, if not conclusive.    The bill is express that the articles are at owner's risk, and the nature of the commodity is such that certainly common carriers could not be compelled to receive and carry it by rail without immunity from responsibility for risks incidental to its nature.    Carriage in winter of articles injured by freezing cannot be compelled, except on the carrier's terms by general or special conditions.    Eggs are subject to more risks than almost any other article of provisions.

From the testimony of the various persons representing the several offices, it can hardly be doubted that this property was sent over a line which was practically one and the same.

The only way-bill received at Buffalo was the one executed at Flint.    The shipment was by one Grand Trunk car, which was expressly named in the bill.    Injury by frost was expressly exempted.    So far as can be gathered from the testimony, this was a shipment for the Grand Trunk Company to go through unchanged, and the way-bill covered the entire transit, and not a transit to Port Huron, which is nowhere named, and apparently nowhere contemplated.

The eggs arrived in Buffalo, December 12.    They did not fill the car, and the testimony is that, whatever may be the case with a full refrigerator car-load, a partial load it is always customary to remove into warehouse.    It would be an oppressive and unreasonable requirement to compel railroad companies to keep out of use their special cars, or any of them, to wait the convenience or caprice of consignees. The testimony is also uncontradicted that perishable property of this kind is customarily called for and removed within a few hours after arrival.    Here the consignee was himself one of the shippers, and gave no name or address of any one else at Buffalo.    He knew of necessity how long a car would take to reach that place under ordinary circumstances.    The

Buffalo agents did what they could to furnish means of early removal, and, had the consignee taken any diligence at all, the eggs would have been in his possession some days before the change of weather endangered them. This delay, I think, cut off any right of recovery whatever. It was not only contributory, but decisive, negligence.

But there is no authority that has been shown for requiring the defendant to build a warehouse with safeguards against destruction of such very perishable articles by extreme cold. The evidence is abundant that its warehouse was like other warehouses. The court below erroneously refused, to allow defendant to show that it compared well with the other freight-houses in Buffalo. The description of it compares favorably with those in general use by warehousemen, of which courts must be supposed to possess the usual knowledge. For many years it is well known that railways used nothing but covered platforms for freight, and consignees are bound to use some diligence, unless they are willing to abide by such accomodation as the roads they employ actually possess. It cannot be deemed wrong for transportation companies to use what is generally considered suitable. No authority has been shown for such requirement.

I think there should be a reversal.

CHAMPLIN, J., concurred with CAMPBELL, C. J.